**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                        Cr.  No. 08-1277 JH

MARCO MANUEL MENDEZ,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's *Motion to Suppress Physical Evidence* [Doc. No. 26] and *Motion to Suppress Statements* [Doc. No. 27], which he filed on October 6, 2008. On February 11, 2009, the Court held an evidentiary hearing on the motions.  Jon Stanford appeared on behalf of the United States, and Daniel Tallon appeared on behalf of the Defendant, Marco Manuel Mendez, who was present.   The primary issue before the Court is whether Mendez, a passenger aboard an Amtrak train traveling through Albuquerque, New Mexico, was illegally detained and whether he voluntarily gave law enforcement officials consent to search the black satchel where the evidence against Mendez was found.  After carefully considering the testimony of the witnesses, the exhibits admitted into evidence, and the law, the Court concludes that the motion to suppress should be denied.

**FACTS**

This case stems from Mendez' arrest in Albuquerque, New Mexico, on May 16, 2008. Several of the key facts regarding the encounter between Mendez and law enforcement are disputed. Based upon the evidence presented at the evidentiary hearing on February 11, 2009, the Court makes

the following findings of fact.[1]

On May 16, 2008, Mendez boarded an Amtrak train in Flagstaff, Arizona heading east to Chicago, Illinois.  That afternoon, the train pulled into the station in downtown Albuquerque, New Mexico.  DEA Special Agent Jarrell Perry ("Perry") also went to the Albuquerque train station that day as part of his duties with DEA Group 1, formally known as the Drug Interdiction Unit.  He was accompanied by an officer from the Bernalillo County Sheriff's Department, Task Force Officer Tim Miller.  Before going to the station, Perry had reviewed the passenger name record for the train on which Mendez was traveling.  Perry noticed that Mendez had purchased a one-way ticket from Flagstaff to Chicago, that he paid $261 in cash for his ticket, and that he had purchased his ticket on the day of departure.  Perry testified that in his experience, drug couriers often purchase one-way train tickets with cash on the day of departure.  He also testified that he knows as a result of his training and experience that drug couriers often travel from certain source cities to particular destination cities.  Accordingly, Perry went to the train station on May 16, 2008 with the intent of finding and speaking with Mendez.  Perry wore plain clothes, and although he did carry a firearm and handcuffs, those items were hidden underneath his clothing.

Knowing that Mendez had purchased a ticket for a seat in coach, Perry boarded the train and began speaking to passengers.  Perry approached Mendez, who was standing in the aisle inside one of the coach passenger cars.  Perry stood out of the aisle, behind one of the seats behind Mendez.  Miller, who also wore plain clothes and a concealed weapon, stood at some distance behind Perry, near the stairs leading down to the first floor of the train.  In a normal, conversational tone, Perry

---

[1] The evidence presented at the hearing included a belt tape recording of the encounter between Perry and Mendez.  The Court admitted the recording into evidence and, in reaching its decision on the motions to suppress, has listened to the recording carefully and repeatedly.

showed Mendez his DEA badge and credentials and asked permission to speak with him.  Mendez

consented.  Perry asked where Mendez was headed and asked to see Mendez' ticket.  Mendez said

he was going to Chicago, retrieved his ticket, and handed it to Perry, who noted that it bore the name

"Marco Mendez."  Perry noted that Mendez was in fact traveling to Chicago, and returned the ticket

to Mendez. He then asked Mendez if he had identification with him; in response, Mendez retrieved

it and gave it to Perry.  Again, Perry saw that the name on the identification card matched the name

on the ticket and then returned the ID to Mendez, who said that he was from Chicago and had flown

to Phoenix to visit family.  However, Mendez said that he did not like to fly and therefore was taking

the train back.  Perry explained why he was there and asked Mendez if he had any luggage with him.

Mendez responded that he had two bags.  Perry asked him where they were.  In response, Mendez

said "There's one right here and one's over here," pointing to a black satchel on the floor near his

seat.  "And one down here?" asked Perry, to which Mendez responded, "Uh huh."  Mendez then led

Perry (with Miller following) down the stairs to the luggage area, where he pointed to a duffel bag

sitting on a luggage shelf.  After confirming with Mendez that the duffel bag contained no weapons,

Perry asked for consent to search the duffel bag, and Mendez agreed.  During the search of the bag

Perry continued to make small talk with Mendez.  He found only clothing in the duffel bag.

Then Perry said, "you've got another bag upstairs?" to which Mendez replied, "uh huh."

Perry asked to see the second bag, the black satchel, which Mendez had left by his seat.  Mendez

returned to his seat upstairs, again followed by Perry and Miller.   When they reached the black

satchel Perry stood partially in the aisle, near Mendez.  Miller again stood behind Perry, somewhere

near the stairway.  Perry moved the black satchel from the floor to the seat and asked, "Would you

voluntarily consent for this bag to be searched also, sir?"  Mendez responded, "For what?" and Perry

3

asked, "What's that?"  Then Mendez said, "I mean, I mean yeah, but I mean . . ."  Then Perry asked, "So you will let me go ahead and search it?" and Mendez said, "yeah" and nodded.  Perry opened the bag and immediately found several hard bundles.  As he did so, Mendez spoke into his cell phone and said, "I got caught."  Perry recognized the bundles as those commonly used to transport illegal drugs and he used his handcuffs, as well as Miller's, to arrest Mendez.

Thereafter, Perry transported Mendez to the Albuquerque DEA office, where he was informed of his *Miranda* rights.  Subsequent field testing identified the bundles in Mendez' bag as approximately 1.1 kilograms of cocaine.

## DISCUSSION

The United States Supreme Court has delineated three types of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment, *see, e.g., Michigan v. Chesternut*, 486 U.S. 567, 574-76, 108 S.Ct. 1975, 1979-81, 100 L.Ed.2d 565 (1988); *INS v. Delgado*, 466 U.S. 210, 218-21, 104 S.Ct. 1758, 1763-65, 80 L.Ed.2d 247 (1984); (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity, *see, e.g., United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884-85, 20 L.Ed.2d 889 (1968); and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause. *See, e.g., Hayes v. Florida*, 470 U.S. 811, 815-16, 105 S.Ct. 1643, 1646, 84 L.Ed.2d 705 (1985); *Dunaway v. New York*, 442 U.S. 200, 212-16, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979).  In this case, the Court must determine whether the encounter between Mendez and law enforcement officials constitutes a consensual encounter or an investigative detention and whether the subsequent consent to search given by Mendez to Perry was

voluntary.

## I.   CONSENSUAL ENCOUNTER OR INVESTIGATIVE DETENTION?

In *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), the Supreme

Court set forth the governing standard for determining whether a police-citizen encounter implicates

the Fourth Amendment:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Id.* 501 U.S. at 439, 111 S.Ct. at 2389 (emphasis added).  "The test is objective (what would the

police conduct have communicated to a reasonable person) and fact specific (based on 'all the

circumstances surrounding the encounter')."  *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir.

1994).

As the United States Supreme Court has explained, "a seizure does not occur simply because

a police officer approaches an individual and asks a few questions."  *Florida v. Bostick*, 501 U.S.

at 434, 111 S.Ct. at 2386.  *See also Florida v. Rodriguez*, 469 U.S. 1, 5-6, 105 S.Ct. 308, 311, 83

L.Ed.2d 165 (1984) (per curiam).  Rather, Supreme Court authority dispels any notion that merely

approaching a person in a public place and asking him to identify himself implicates the Fourth

Amendment.  *See United States v. Drayton*, 536 U.S. 194, 200, 122 S.Ct. 2105, 2110 (2002) ("Law

enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures

merely by approaching individuals on the street or in other public places and putting questions to

them if they are willing to listen.");  *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762-63

(1984).  Nor does an officer's request for consent to search a person's luggage turn an otherwise

5

consensual encounter into an investigative detention "as long as the officers do not convey a message that compliance with their request is required." *Bostick*, 501 U.S. at 435, 111 S.Ct. at 2386 (citations omitted). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *Drayton*, 536 U.S. at 201, 122 S.Ct. at 2110.

Mendez argues that Perry seized him during their encounter on the train because Perry's words and actions did not convey the message that Mendez was free to leave or terminate the encounter at any time. Mendez contends by showing his badge, identifying himself as a police officer, and questioning Mendez about his tickets, identification, and baggage, combined with the fact that Perry was standing nearby and the fact that there were two officers, Perry created a situation in which no reasonable person in Mendez' position would feel free to leave. According to Mendez, "a reasonable person would not have felt free to leave the train while the officer was demanding documents and asking questions." Doc. No. 28 at p. 10. The Court disagrees. As explained by the Supreme Court in *Bostick*, *Rodriguez*, *Drayton*, and *Delgado*, *supra*, the nature and the subject matter of Perry's questions were entirely permissible, particularly given the conversational tone that Perry used.

Further, in determining whether a defendant was seized, the Tenth Circuit has considered a variety of factors, including whether the encounter occurred in a confined or nonpublic space, *United States v. Griffin*, 7 F.3d 1512, 1518-19 (10th Cir. 1993); *United States v. Bloom*, 975 F.2d 1447, 1453-54 (10th Cir. 1992); *United States v. Ward*, 961 F.2d 1526, 1531 (10th Cir. 1992), *but see United States v. Little*, 19 F.3d 1499, 1504 n.5 (10th Cir. 1994); the officers confronting the

subject were armed or uniformed, *Bloom*, 975 F.2d at 1454; the officers retained the defendants

personal effects, such as tickets or identification; *United States v. Spence*, 397 F.3d 1280, 1283 (10th

Cir. 2005); the officers brandished weapons, *United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir.

1999); more than one officer confronted the subject, *Bloom*, 975 F.2d at 1454; *Ward*, 961 F.2d at

1533; the officers exhibited an intimidating or coercive demeanor, *Griffin*, 7 F.3d at 1519; *Ward*,

961 F.2d at 1533; the officers physically touched the subject, *Hill*, 199 F.3d at 1148; and the officers

asked the subject potentially incriminating questions, *Griffin*, 7 F.3d at 1519; *Ward*, 961 F.2d at

1534; *Bloom*, 975 F.2d at 1454.  However, the Tenth Circuit has steadfastly refused to view any one

of these factors as dispositive. *See, e.g., Griffin*, 7 F.3d at 1518 ("In the past, we have avoided

hardline rules to govern [seizure] analysis, and our opinion today should not be interpreted as an

exhaustive announcement"); *see also United States v. Little ("Little I")*, 18 F.3d 1499, 1503 (10th

Cir. 1994) (en banc) (noting that "only in rare instances will any one factor produce an inexorable

conclusion that a seizure has occurred").  "When viewing the totality of the circumstances, it may

be that the strong presence of two or three factors demonstrates that a reasonable person would have

believed that he was not free to terminate an encounter with government officials."  *Jones v. Hunt*,

410 F.3d 1221, 1226 (10th Cir. 2005).

　　　　In this case, Perry opened the conversation by identifying himself, showing his credentials,

and asking for permission to speak to Mendez.  Perry phrased his words as a request, rather than as

a demand.  The audio tape of the encounter demonstrates that at all times Perry used a calm,

conversational, and civil tone of voice.  Perry reviewed Mendez' ticket and identification, but then

returned them immediately.  Neither Perry nor Miller was in uniform, brandished a weapon, or

physically touched Mendez.  Only Perry spoke with Mendez, and his questions were not

incriminating. Miller did not "double team" Mendez with questions, and he stood some distance away from Mendez. In addition, the entire encounter took place in public areas of the train, where other people were present (and can be heard on the belt tape). While there may have been close quarters on the train, the Court finds that neither Perry nor Miller was standing so close to Mendez as to create a reasonable feeling that he was detained. It is true that Perry did not inform Mendez that he had a right to refuse to answer his questions. *United States v. Orrego-Fernandez*, 78 F.3d 1497, 1505 (10th Cir. 1996), *United States v. Little ("Little II")*, 60 F.3d 708, 713 (10th Cir. 1995). However, that is but one factor in the totality of the circumstances test, and the Court finds that it is outweighed by the other factors discussed above. Therefore, under the totality of the circumstances, the Court concludes that the discussion between Perry and Mendez was a consensual encounter rather than an investigative detention for which reasonable suspicion was required.

The Court notes that at the evidentiary hearing, Mendez testified that he felt uncomfortable in the officers' presence in part because he knew that he had cocaine in his black satchel, and he did not feel free to walk away or decline to show Perry his bags because that would have aroused Perry's suspicions. Mendez has made similar arguments in his brief in support of his motions to suppress. However, Mendez' reliance upon his own subjective belief and feelings that he was not free to leave is unpersuasive. "Whether an encounter is a detention or a consensual encounter depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996). Because this test is an objective one, Mendez' reliance on his subjective belief to support his claim of an illegal detention is misplaced. *Id*. at 1499.

**II.      CONSENT TO SEARCH THE BLACK BAG WHERE DRUGS WERE FOUND**

Mendez' second argument is that his consent to the search of his black satchel was either not given at all, or was given involuntarily. This argument fails for many of the same reasons outlined in Part I of this Memorandum Opinion and Order, *supra*.

There appears to be no dispute that Mendez' black satchel is an "effect" protected by the Fourth Amendment, and that as one claiming ownership of the bag, Mendez has standing to contest both the search and the admissibility of the evidence found inside. The general rule is that law enforcement officers must obtain a warrant in order to search one's personal effects. However, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Thus, the question is whether Mendez gave valid consent to the search of his bag. The voluntariness of consent must be determined from the totality of the circumstances, *United States v. West*, 219 F.3d 1171, 1177 (10th Cir. 2000), and the government bears the burden of proof on the issue. *See U.S. v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993) (citation omitted); *United States v. Cody*, 7 F.3d 1523, 1526 (10th Cir. 1993) (the government has the burden of proving valid consent to a warrantless search).

The Tenth Circuit has utilized a two-part test to make this determination: "First, the government must proffer 'clear and positive testimony that consent was unequivocal and specific and freely given.' Furthermore, the government must prove that this consent was given without implied or express duress or coercion." *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (quoting *United States v. Angulo-Fernandez*, 53 F.3d 1177, 1180 (10th Cir. 1995)).

The undisputed evidence is that Mendez specifically, clearly, and unequivocally gave Perry consent to search the bag. At the evidentiary hearing on the motions to suppress, Mendez' testimony

controverted Perry's testimony in several respects.  For example, Mendez testified that he never indicated to Perry that the black satchel belonged to him, which conflicts with Perry's testimony. However, on the belt tape one can hear Perry ask Mendez if he has any bags, and Mendez responds that he has two.  Perry then asks where they are.  Mendez responds, "There's one right here and one's over here."  Thus, it seems clear that Mendez identified the black satchel as well as the duffel bag in the downstairs luggage compartment.  A few seconds later Perry asked, "You got one down here?", presumably referring to the duffel bag in the downstairs luggage rack, to which Mendez responded, "Uh huh."  The Court finds that Mendez' testimony is inconsistent with the belt tape in other respects as well.  For example, Mendez denies saying "yeah" to Perry's second request to search the black satchel and denies saying "I got caught" on his cell phone as Perry searched the black satchel.  However, after careful listening the Court was able to hear Mendez make those statements on the belt tape.

In short, the Court finds Perry's testimony as to the events of that day more credible than that of Mendez.[2]  For that reason, the Court concludes that after Perry asked to search the black satchel the first time, Mendez said, "I mean, I mean yeah, but I mean . . . ."  The Court also concludes that after Perry's second request for consent to search the black satchel, Mendez said "yeah" and nodded his head.  Finally, the Court concludes that Perry began his search of the black satchel after Perry said "yeah" the second time and nodded his head, and not before as Mendez testified.  Based on those facts, the Court finds that Mendez gave Perry unequivocal and specific consent to search the

---

[2] Counsel for Mendez has raised an issue regarding Perry's credibility in an unrelated pending matter before the District Court.  However, the Court finds that in this case, the belt tape corroborates Perry's testimony and undermines Mendez' testimony.  Therefore, under the specific facts and circumstances of this case, the Court finds Perry to be credible.

black satchel.  Thus, the first prong has been satisfied, and the Court must turn to the question of whether that consent was obtained through duress or coercion.

"In determining whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant." *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994).  Other factors tending to show that consent was coerced include the presence of more than one officer, the display of weapons, physical touching, and use of an aggressive tone.  *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991).  In all, the court should consider whether the officer's conduct constituted a coercive show of authority, such that a reasonable person would believe he was not free to "decline the officer's requests or otherwise terminate the encounter." *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (quotation omitted).

As explained above, in this case there is no evidence that Perry or Miller used physical mistreatment, violence, threats of violence, display of weapons, physical touching, an aggressive tone of voice, promises, inducements, deception, or trickery in order to obtain Mendez' consent to search the bag.  Indeed, Mendez does not allege any "physical mistreatment, violence, threats, promises or inducements, deception or trickery, display of a weapon, [or] use of a commanding manner or tone of voice." *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996). Furthermore, Mendez' mental and physical condition are not an issue here.  And while two officers were present, that fact alone does not amount to duress or coercion where, as here, the evidence demonstrates that the officers did not use physical intimidation and one of the officers did not even speak to Mendez.  Accordingly, under the totality of the circumstances, the Court finds that Mendez

11

voluntarily gave Perry his consent to search the bag where the contraband was found.

Having found no violation of Mendez' Fourth Amendment rights,

**IT IS THEREFORE ORDERED** that Defendant's *Motion to Suppress Physical Evidence* [Doc. No. 26] and *Motion to Suppress Statements* [Doc. No. 27] are **DENIED**.


_____
**UNITED STATES DISTRICT JUDGE**